**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO GONZALEZ, | No. C 07-2303 MHP (pr) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT FOR REMAINING DEFENDANTS** |
| v. | |
| D. L. RUNNELS; et al., | |
| Defendants. / | |

## INTRODUCTION

Francisco Gonzalez, a prisoner at Pelican Bay State Prison, filed this pro se civil rights action under 42 U.S.C. § 1983, alleging several claims of deliberate indifference to his serious medical needs. Most of the claims asserted by plaintiff already have been resolved against him in one of several orders, i.e., the September 21, 2007 order of dismissal with leave to amend, the July 31, 2008 order of service, the September 28, 2009 order of partial dismissal, and the September 28, 2009 order granting summary judgment for defendant Martinelli. As a result of the rulings in those orders, the only issue left for adjudication is the claim that four defendant doctors were deliberately indifferent in that they "refused to provide corrective surgery on [plaintiff's] right torn rotator cuff." Second Amended Complaint, p. 3H. That claim is the subject of the pending motion for summary judgment filed by defendants Jain and Sayre and the separately filed motion to dismiss and for summary judgment filed by defendant Marino. For the reasons discussed below, defendants' motions will be granted and judgment will be entered against Gonzalez.

## BACKGROUND

Gonzalez is an inmate at Pelican Bay State Prison who has numerous medical problems, including psychiatric problems, chronic gastrointestinal problems, and occasional shoulder problems. Gonzalez alleged in his second amended complaint that "the CMO [i.e., Dr. Sayre] & Dr. Jain, Dr. Marino, Dr. Clark refused to provide corrective surgery on his right torn rotator cuff that was damaged by C/O Freeman and C/O Martens." Second Amended Complaint, p. 3H. In a later filing he stated that "Dr. Buscho diagnosed the torn rotator cuff in 2005." Docket # 77, p. 4. He also states that he continually complained of, among other things "shoulder pain/torn rotator cuff through sick call slips (Exh. A-2)." Docket # 77, p. 5.

The following facts are undisputed unless otherwise noted:

The incidents complained of occurred at Pelican Bay State Prison.

Gonzalez was a prisoner at Pelican Bay during the relevant time period.

Defendant Michael Sayre, M.D. was the chief medical officer ("CMO") at Pelican Bay, and has held that position since July 2005. Dr. Sayre was responsible for administering Pelican Bay's medical program and responding to certain inmate appeals regarding medical issues. He was not directly involved in the care of Gonzalez's shoulder, except that he once ordered Tylenol for him.

Defendant B. Jain, M.D. was a contract physician at Pelican Bay from March 2006 through April 2008. She was one of Gonzalez's treating physicians from approximately May 2006 through May 2007. Dr. Jain never diagnosed Gonzalez as having a torn rotator cuff.

Defendant Rick J. Marino, M.D. was employed by the California Department of Corrections and Rehabilitation as a physician from July 1, 2005 through April 2006. Dr. Marino is an internist. He is not a surgeon, and has never performed shoulder surgery or arthroscopy of a shoulder. Dr. Marino provided medical services to Gonzalez between August 8, 2005 and March 12, 2006. During that time, Dr. Marino treated Gonzalez 34 times. The vast majority of Gonzalez's visits to Dr. Marino pertained to his chronic abdominal and gastrointestinal problems. Gonzalez mentioned his shoulder pain only once to

Dr. Marino.

Gonzalez's medical records do not contain any diagnosis of a torn rotator cuff.

Gonzalez's medical records do not contain any recommendation from any doctor for shoulder surgery for Gonzalez.

There is evidence that Gonzalez complained of shoulder pain occasionally and was treated for those complaints. The medical records show the following:

Gonzalez complained of shoulder pain on the night of June 1, 2005. He was given ibuprofen. In the early hours of June 2, 2005, he again complained of shoulder pain and told a nurse that the ibuprofen was not effective. The nurse called Dr. David and informed him that Gonzalez was cradling his right arm and unable to move it. Dr. David examined Gonzalez on June 2, 2005. Dr. David noted that there was no obvious deformity in his right shoulder, that Gonzalez did not express any tenderness to palpation, and there was no effusion. Gonzalez told Dr. David that his arms and shoulder had been hurting for about two days, following an altercation a few days earlier. Dr. David referred Gonzalez for an x-ray of his right shoulder and prescribed Tylenol.

On June 3, 2005, x-rays were taken of Gonzalez's shoulders. The radiologist's report stated for the right shoulder: "No soft tissue calcifications are noted. The joints are unremarkable and the bony structures are intact. Impression: Normal right shoulder." Sayre Decl. Exh. A at 14. The left shoulder also was normal, according to the same report.

On June 20, 2005, the x-ray results were discussed with Gonzalez. Gonzalez reported that ibuprofen better controlled his shoulder pain than Tylenol. Motrin then was prescribed for him.

Almost six months went by before Gonzalez next complained of some kind of shoulder pain. On December 4, 2005, he submitted a health care services request form in which he mentioned that he had several problems including pain that "goes through my right shoulder." Id. at 16. He was seen by a nurse on December 15, 2005, who observed that he had some difficulty with the range of motion in his neck but that the range of motion in his arm was "ok." Id at 23. The nurse referred Gonzalez for a follow-up appointment with his

Primary Care Physician on December 22, 2005, but Gonzalez failed to attend the appointment.

Gonzalez was admitted to the Correctional Treatment Center – an on-site hospital at the prison -- from January 12 - March 14, 2006 for gastrointestinal issues. During that three-month stay, he complained of shoulder pain three times. On two occasions Gonzalez refused pain medication due to his chronic gastrointestinal problems. On January 26, Dr. Sayre prescribed ibuprofen for the shoulder pain — either 40 pills or pills for 40 days. Id. at 42. On January 28, Gonzalez was seen by Dr. Marino, who was primarily monitoring his gastrointestinal problems. Dr. Marino wrote that there was some suspicion by nursing staff of the legitimacy of Gonzalez's vomiting episodes, that Gonzalez had been "treated for C Diff colitis" and that his medications recently had been changed. Dr. Marino also wrote, "inmate easily complaintive of various problems such as wanting to discuss his shoulder ache and concern it might be a rotator cuff tear. Also a chest pressure that appears related to his dry heaving. GERD?" Marino Decl., ¶ 19 and Exh. B at 1/28/06 notes. Dr. Marino physically examined Gonzalez and noted "abdomen is soft and nontender. BS intact. No distention. No areas of mass appreciated. Lungs CTA. Heart RRR Extrem warm and no edema." Id. Dr. Marino wrote a plan for the continued treatment of Gonzalez's gastrointestinal problems. Id. at 44.

On April 14, 2006, Gonzalez was seen by Dr. Swiney for a follow-up appointment concerning his gastrointestinal issues. Dr. Swiney also prescribed Tylenol for Gonzalez's right shoulder pain for 30 days.

On May 15, 2006, Dr. Jain saw Gonzalez for a follow-up visit concerning his abdominal symptoms. Gonzalez asked to discontinue taking Tylenol for his shoulder pain. Dr. Jain planned to discontinue the Tylenol.

On May 17, 2006, Gonzalez submitted a health care service request form, complaining of pain in his abdomen, nausea, a sour taste in his mouth, occasional vertigo, pain in his right shoulder, pain in his neck, and numbness in his fingers. A nurse examined him the next day and referred him for an appointment with his Primary Care Physician.

4

On May 23, 2006, Gonzalez submitted a health care service request form, complaining of blood in his mouth, abdominal pain, and "unbearable" pain in his right shoulder. Id. at 57. A nurse interviewed him the next day, and at that time Gonzalez complained of pain in his right shoulder of "5-6/10" that increased with all movements. Id. He was able to raise his arm with slight hesitation and restriction of movements. Gonzalez stated that the pain was in his "'rotator cuff'" area radiating down to his elbow. Id. at 58. The nurse noted that Gonzalez had an appointment scheduled with Dr. Jain on June 19, 2006, and would add the shoulder pain issue to the list to be addressed at that visit.

On June 19, 2006, Dr. Jain saw Gonzalez for a follow-up visit concerning his gastrointestinal symptoms. In addition to addressing the gastrointestinal problems, they discussed his right shoulder pain and the possibility of him taking anti-anxiety medications. As to the right shoulder pain, Gonzalez said he had been using myoflex cream[1] and wanted to renew it.

Sixteen months went by before Gonzalez next complained of shoulder pain. On October 31, 2007, Gonzalez submitted a health care services request form in which he complained of nausea, a backache, ongoing right shoulder pain, dizzy spells, and constant fatigue. He was examined by a nurse at his cell on November 2, 2007. His current treatment was discussed and when the nurse asked Gonzalez "what could be done for him that has not already been adequately addressed by his treatment team and requested [inmate's] assistance in meeting his needs at this time. [Inmate] stated 'I don't know man. You're the doctor! You tell me!' He then insisted emphatically stating 'I'll make it real simple for you, man. I'm gonna go through this process over and over...' until he gets surgery, a chrono for an extra sack lunch and reglan." Id. at 69. (It is not clear which of his several problems he wanted surgery to address.) Gonzalez refused to go to the clinic to have his vital signs taken, stating that he did not need them. He was referred for a routine appointment with his Primary Care Physician.

On November 8, 2007, Gonzales submitted a health care services request form complaining of vomiting and nausea, and also stating that his shoulder and back pain had not

5

been addressed. He was examined by a nurse that day, and she reported that he had been given some cream for his back but it didn't work. Gonzalez also was observed "moving around without overt signs of pain in back and shoulder," and was able to quickly remove his shirt to have his allergy testing area examined. Id. at 78.

On November 10, 2007, Gonzalez submitted a health care services request form complaining of nausea, vomiting, extreme fatigue, and back and shoulder pain. He was examined by a nurse that day, but did not voice any complaints about his back and shoulder pain or fatigue. He was given medicine for his nausea and vomiting.

On December 5, 2007, Gonzalez was seen by a nurse practitioner for various medical concerns. He denied having pain in his shoulder and back.

Another ten months went by before Gonzalez next complained of shoulder pain. On October 24, 2008, Gonzalez told a nurse that his right shoulder had been painful and voiced other medical concerns. He said that he had right shoulder problems for two years. The nurse noted that Gonzalez was able to sit on and get off the exam table with ease, that his upper body was visually inspected and appeared to have equal musculature on the right and left sides, that Gonzalez did not indicate any pain or discomfort when the nurse firmly palpated his shoulder, and that his last x-ray was in 2005 and was within normal limits. The nurse told him not to do any upper body exercises that might cause pain until cleared by his Primary Care Physician.

On November 3, 2008, when Dr. Williams saw Gonzalez for a follow up on his allergies and blood test, Gonzalez reported having pain in his shoulder. It is not clear what treatment was offered, but there is no evidence any defendant took part in this visit.

Dr. Sayre stated that he found no further mention of shoulder pain in Gonzalez's medical records after November 3, 2008.

In addition to the above mentioned encounters, Gonzalez submitted health care request forms or was seen by medical personnel at the prison on at least 114 additional occasions between his arrival at Pelican Bay on March 25, 2005 and his filing of the second amended complaint on November 2, 2007.

6

**DISCUSSION**

A.   Deliberate Indifference Claim

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 102-04 (1976). To prove that the response of prison officials to a prisoner's medical needs was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2) deliberate indifference to that need by prison officials. See McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. See Farmer v. Brennan, 511 U.S. 825, 837, 844 (1994). A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.), cert. denied, 519 U.S. 1029 (1996). Where defendant doctors have chosen one course of action and a plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Id.

   1.   No Evidence Of Rotator Cuff Tear Or Need For Surgery

Gonzalez's claim of an unrepaired torn rotator cuff fails on both the objective and subjective prongs of the Eighth Amendment test. First, he fails to show a triable issue of fact that he had a serious medical need because there is not a whit of evidence that he had a torn rotator cuff or that any doctor ever told him he needed rotator cuff (or any shoulder) surgery. Gonzalez's statement that a doctor told him he had such a condition is inadmissible hearsay evidence. His self-diagnosis does not create a triable issue of fact. Even if Gonzalez had presented evidence that he had a torn rotator cuff, there is no evidence that a torn rotator cuff always requires surgical repair. With this complete absence of evidence of the claimed

7

condition, no reasonable jury could conclude that he had a torn rotator cuff or needed rotator cuff surgery. The torn rotator cuff claim falters on the subjective prong for similar reasons. Without any evidence of the claimed condition, it follows that no defendant knew of it, let alone acted with deliberate indifference to it. Not only is there an absence of evidence of defendants acting with deliberate indifference, there is affirmative evidence that the physical exams and x-rays that were done yielded normal results. If a defendant looked at Gonzalez's records to determine his condition, he or she would have learned that Gonzalez had a normal x-ray and normal physical exams. With the utter absence of evidence of a torn rotator cuff and utter absence of evidence that any defendant knew he had one and failed to do anything about it, no reasonable jury could find in Gonzalez's favor on the torn rotator cuff claim.

### 2. Shoulder Pain Complaints

The court also considers the possibility of a differently-defined shoulder problem. The evidence that Gonzalez complained of shoulder pain occasionally might allow a reasonable jury to conclude that the shoulder pain amounted to an objectively serious medical condition. The evidence is slight – Gonzalez's shoulder pain was only occasional, could be treated with over-the-counter medications, and didn't result in any notable findings on the x-rays or physical exams – but the fact that it was recurring and did necessitate some pain relievers is sufficient to allow a jury to find the objective prong satisfied. The shoulder pain was pain that doctors and patient found worthy of treatment, and was pain that was chronic and sometimes substantial. See McGuckin, 974 F.2d at 1059-60. There is a triable issue of fact that the shoulder pain was a serious medical need.

Having determined that there is a triable issue of fact that Gonzalez's shoulder pain was a serious medical need only takes care of the first of the two prongs of the Eighth Amendment test. A plaintiff also must establish the subjective prong, i.e., that defendants responded with deliberate indifference to that serious medical need. Gonzalez fails to raise a triable issue of fact on the subjective prong. On the evidence in the record, no reasonable jury could conclude that any defendant responded with deliberate indifference to Gonzalez's

serious medical need. The evidence shows that when Gonzalez complained of shoulder pain, he was examined and/or given pain relievers. X-rays were taken at the prison, and the results showed normal shoulders. His shoulder was physically examined several times, and no abnormalities were noted.

With regard to Dr. Jain, the undisputed evidence shows that, while she was Gonzalez's treating physician, she saw him 13 times (usually for gastrointestinal problems) and on only two occasions did he mention shoulder pain. On one of those occasions, Gonzalez wanted to discontinue the Tylenol and Dr. Jain noted that; on the other occasion she re-ordered the myoflex cream he wanted.

With regard to Dr. Sayre, the evidence is undisputed that he only was involved in the care of Gonzalez's shoulder once, and on that occasion he ordered Tylenol. Preparing an order for Tylenol for intermittent pain such as Gonzalez had did not amount to deliberate indifference. Dr. Sayre had no liability under a respondeat superior theory simply because he was the chief medical officer at the prison.

With regard to defendant Dr. Marino, the evidence shows that he was monitoring Gonzalez's gastrointestinal problems for which Gonzalez was staying at the prison hospital. Dr. Marino's note that the patient was "easily complaintive of various problems such as wanting to discuss his shoulder ache and concern that it might be a rotator cuff tear" would not allow a reasonable trier of fact to conclude that Dr. Marino acted with deliberate indifference to a known serious medical need. Although Dr. Marino did not provide medication for the pain, Dr. Sayre had just ordered Tylenol for Gonzalez two days earlier. Also, after this one comment on January 28, 2006, Gonzalez never mentioned a shoulder ache again to Dr. Marino, even though Dr. Marino examined him the next seven days in a row. Indeed, Dr. Marino examined Gonzalez twenty times over the remaining six weeks in the hospital, and Gonzalez never again mentioned the shoulder ache.

Gonzalez complained of shoulder pain on several occasions, saw health care providers on several occasions, and received some diagnostic tests and some treatment for his complaints of shoulder pain. Gonzalez apparently thinks defendants should have approached

9

his shoulder complaints in a way different than they did, but that shows at most a difference of opinion about the proper course of care for him. To survive summary judgment, Gonzalez had to come forward with evidence that would allow a reasonable jury to conclude "that the course of treatment the doctors chose was medically unacceptable under the circumstances," and that they "chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d at 332. He did not do so. Gonzalez has failed to set forth evidence that would allow a reasonable trier of fact to conclude that any defendant acted with deliberate indifference to his complaints of shoulder pain.

Almost all of the evidence and argument Gonzalez has presented since the filing of the pending summary judgment motions do not pertain to the shoulder problem, and instead pertain to his gastrointestinal problems. Those gastrointestinal problems are chronic and have resulted in hundreds of pages of medical records, numerous tests, and multiple trips to the prison hospital and an outside hospital. The claims about the medical response to plaintiff's gastrointestinal problems were resolved against plaintiff in the order of partial dismissal and the order granting summary judgment to defendant Martinelli. The evidence about the gastrointestinal problems is simply irrelevant to the shoulder claim.

Gonzalez has failed to raise a triable issue of fact on his claim that defendants acted with deliberate indifference to a serious medical need. Gonzalez has not established "'a genuine issue for trial'" that defendants were deliberately indifferent to his complaints of shoulder pain. See Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Defendants therefore are entitled to summary judgment in their favor on the Eighth Amendment claim.

B.   Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

1    In determining whether the defendants are entitled to qualified immunity, the usual
2 first step is to answer this threshold question: "Taken in the light most favorable to the party
3 asserting the injury, do the facts alleged show the officer's conduct violated a constitutional
4 right?" Saucier v. Katz, 533 U.S. 194, 194 (2001).  If no constitutional right was violated if
5 the facts were as alleged, the inquiry ends and the defendants prevail.  As discussed above,
6 the evidence in the record does not raise a triable issue of fact that any defendant was
7 deliberately indifferent to Gonzalez's serious medical needs.  The inquiry thus ends and
8 defendants prevail on their qualified immunity defense.

9 C.     Other Matters

10    The unserved defendant problem: Defendant Clark never appeared in this action and
11 apparently never was served with process.[2]  Plaintiff's failure to show a triable issue of fact
12 on the deliberate indifference to medical needs is largely the same for this unserved
13 defendant as the other defendants.  The absence of any evidence that Gonzalez was
14 diagnosed with a torn rotator cuff and absence of any evidence that any doctor
15 ordered/recommended rotator cuff surgery are fatal to his rotator cuff claim, regardless of
16 which doctor is a defendant.  The absence of any medical record indicating that Gonzalez
17 made Dr. Clark aware of any other shoulder pain dooms a claim for deliberate indifference to
18 his shoulder pain.   Therefore, the court will enter judgment in favor of Dr. Clark without
19 pausing to wait for plaintiff to provide information about locating the unserved defendant so
20 that process may be served on him before judgment is entered.

21    The Disqualification Request: Gonzalez recently has filed a motion to disqualify the
22 undersigned.  He argues that the action is being delayed and that some of his discovery and
23 photocopy requests are being delayed.  He also asserts that defense counsel has entered into a
24 settlement agreement without plaintiff's legal representative being present, and that defense
25 counsel sent an ex parte letter to the undersigned.  None of these assertions has any merit.
26 The delay in resolution of this action is largely of plaintiff's making, as he has requested and
27 received lengthy extensions of time to respond to defendants' motions – one of which has
28 been pending for more than nine months.  Plaintiff's complaint about discovery appears to

pertain to his quest to obtain copies of notes from an alleged "health care review committee," but prison officials have informed him there is no committee by that name. If there is no such committee, there are no such notes. The sheer volume of materials filed by plaintiff belies his contention of any serious interference with his photocopying efforts. The contention that there has been a settlement without plaintiff's legal representation makes no sense at all: if the case had settled, there would not be pending motions. Defense counsel has not engaged in any ex parte communication with the undersigned. The motion to disqualify is denied.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by defendants Sayre and Jain is GRANTED, and the motion for summary judgment filed by defendant Marino is GRANTED. (Docket # 101, # 125.) Judgment now will be entered against plaintiff and in favor of defendants.

Plaintiff's motion to disqualify the undersigned is DENIED as frivolous. (Docket # 135.) Plaintiff's "motion, late filing" filed on September 7, 2010 is GRANTED only to the limited extent that the court permits the accompanying opposition to defendant Marino's motion for summary judgment. (Docket # 137.)

IT IS SO ORDERED.

Dated: September 14, 2010

_____
Marilyn Hall Patel
United States District Judge

## **NOTES**

1. Myoflex cream is a topical pain relieving cream.

2. The U.S. Marshal attempted to serve Dr. Clark at Pelican Bay and learned that Dr. Clark was not at that prison. (Docket # 16.) At the court's request, defense counsel provided an address for Dr. Clark at Newport Oncology & Healthcare Medical Inc. in Suisun City, California. (Docket # 96.) The court ordered the Marshal to attempt service at two different addresses for Dr. Clark at Newport Oncology – one address in Suisun City and another address for Newport Oncology in La Selva Beach, California. The Marshal mailed the summons and complaint but one of the addresses was "a bad address" and no response was ever received. (Docket # 114.) It now appears that the Marshal was trying to serve the wrong Dr. Clark. Plaintiff filed a complaint with the Medical Board of California against a Dr. Cornell Clark, whose address is in Tulsa, Oklahoma. See Docket # 121 at pp. 35, 37. Plaintiff never informed the court that Dr. Clark's first name was Cornell or that his address was in Oklahoma.

  As mentioned in the text, plaintiff has failed to show a triable issue of fact on his deliberate indifference claim. Therefore, the court will not take the time to find out which of the more than fifty doctors with the last name of Clark listed on the California Medical Board website is the person plaintiff wants to sue.